IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
--- Charleston Division ---

| | | |
|---|---|---|
| Leah Doughty, | ) | Civil Action No. <u>2:23-cv-01059-DCN</u> |
| Plaintiff | ) | |
| | ) | |
| v. | ) | **COMPLAINT** |
| | ) | |
| J. Crew Group, Inc., d/b/a J. Crew Factory, | ) | <u>Jury Trial Demanded</u> |
| | ) | |
| Defendant | ) | |

**Nature of the Action**

This is an action to enforce plaintiff Leah Doughty's rights and remedies arising out of defendant J. Crew Group, Inc.'s employment contract breach and wrongful termination.

**Parties**

1.      Plaintiff Leah Doughty ("Doughty") is a citizen and resident of Berkeley County, South Carolina.

2.      Defendant J. Crew Group Inc., d/b/a J. Crew Factory ("J. Crew") is a duly organized Delaware corporation having a principal place of business at 225 Liberty St., New York, New York 10281.

**Jurisdiction and Venue**

3.      This court has original subject matter and personal jurisdiction over the parties and claims herein pursuant to 28 U.S.C. § 1332, because there is complete diversity between the plaintiff and defendant and the amount in controversy exceeds $75,000. This court has supplemental jurisdiction over any pendant state law claims pursuant to 28 U.S.C. § 1367.

4.      Venue is proper before this court pursuant to 28 U.S.C. § 1391(b), because the defendant resides, and a substantial part of the events or omissions giving rise to the claims

occurred, within the District of South Carolina.

5.     Division assignment to this Court is proper because a substantial part of the event and omissions giving rise to the claims herein occurred in Charleston County, South Carolina. (LR. 3.01(B) certification).

## Factual Allegations

6.     Defendant J. Crew is an American multi-brand, multi-channel, specialty retailer of clothing apparel and accessories. The Defendant company operates more than 450 retail stores and online throughout the United States.

7.     In October 2019, Doughty and J. Crew entered into certain verbal and written employment agreements for Doughty to work as a store director.

8.     For three (3) years, Doughty in every way performed her job responsibilities and received raises and bonuses for her performance resulting in a base annual salary of seventy-five thousand dollars  ($75,000.00) plus annual benefits and bonuses ("Contract").

9.     At all relevant times, Doughty performed all her responsibilities and obligations under the Contract in her capacity as a full-time dedicated retail store director for store nos. 116 and 1007 and as a developer on J. Crew's nation-wide "new employee" training team.

10.     Doughty received positive year-end performance and sales reviews from her superiors and was awarded the distinguished "top performer" store director award on more than one occasion. As a top performer at J. Crew, Doughty was appointed to an elite team of ten (10) employees out of J. Crew's thousands of employees to design, develop and implement J. Crew's "Centralized Virtual Trainers" program designed to transition new hires into the J. Crew family.

11.    J. Crew has a strict company policy that prohibits a J. Crew employee from living with another J. Crew employee[1] ("Employee Resident Rule").

12.    Store directors, like Doughty, are charged with the responsibility of managing, investigating and enforcing subordinate employee compliance with J. Crew's policies, like the Employee Resident Rule.

13.    In late 2022, J. Crew hired Kyle Manno ("Manno") to work in Doughty's Mount Pleasant, South Carolina, retail location.

14.    Shortly after Manno was hired, he recommended to Doughty that she hire a young man, Jack Lord ("Lord") to join the J. Crew team at her store location as a retail floor sale representative. Manno told Doughty that Lord didn't drive but that wouldn't be a problem because he [Manno] would provide Lord transportation to and from work.

15.    Manno represented to Doughty that he was a Catholic Priest and that he and Lord attended church services together. Manno told Doughty that he "wanted to help" Lord with employment and was "happy to drive him to work".

16.    Thereafter, Lord began working in Doughty's J. Crew retail store location; and, Doughty observed Manno and Lord arriving at work, and leaving work, together in Manno's car.

17.    In late 2022, Doughty came to learn that Manno might be living with Lord in violation of J. Crew's Employee Resident Rule. Doughty requested a private meeting with Manno to inquire if Manno was in fact living with Lord in violation of J. Crew's Employe Resident Rule. At this meeting, Doughty inquired whether Manno was (i) aware of J. Crew's Employee Resident Rule; and, (ii) whether Manno was living with Lord in violation of J. Crew's Employee Resident Rule.

---

[1] J. Crew Employee Handbook, p. 20.

18.     At the meeting, Manno admitted that he was aware of J. Crew's Employee Resident Rule, and he emphatically denied that he and Lord were living together in violation of J. Crew's Employee Resident Rule. Manno added that he provides transportation to Lord because Lord lives at the same address where Manno "gets his mail."

19.     Shortly after the meeting, Doughty became suspicious when she observed Manno and Lord's interactions appeared to be more than a church relationship. Specifically, Manno appeared to be more like a "father" to Lord; and, their interactions gave the appearance of two people who live together in the same home.

20.     Simultaneously, a concerned J. Crew employee told Doughty that Manno was very offensive to her – yelled at her – and other woman at the store behind Doughty's back when Doughty was not present at the store.

21.     Doughty immediately took this information to her District Manager, Martin Nelson ("Nelson"); who, in response, set up a telephone conference between Doughty, Nelson and Manno. During this conference call, Manno again emphatically denied to Doughty and to Nelson that he was living with Lord.

22.     As more time passed, Doughty began to realize that Manno was in fact living with Lord in violation of J. Crew's Employee Resident Rule and that he (i) misrepresented to her Manno and Lord's putative church relationship; (ii) misrepresented his living situation on J. Crew's paperwork; (iii) lied to her when she directly asked Manno whether he was living with Lord; (iv) lied to J. Crew's District Manager, Nelson, during the conference call; and, (v) was hostile with co-employees behind her back – all in violation of J. Crew's code of ethics, employee guidelines and Employee Resident Rule.

23.     Following the conference call, Manno continued to assert that he was not living with Lord in violation of J. Crew's employee resident rule.

24.     On or about January 31, 2023 at 8:00 a.m., Doughty, while enroute to get a coffee, drove by the location that Manno represented to Doughty and to J. Crew to be his "mailing address".

25.     While driving past Manno's putative "mailing address", Doughty observed Manno's car at the address.

26.     Upon returning to the store, Doughty telephoned her District Manager, Nelson, and advised him that Manno (i) misrepresented to her Manno's putative church member relationship with Lord; (ii)  directly lied to her when he denied that he and Lord were living together; (iii) was hostile with co-employees behind her back; and, (iv) was living with Lord – in violation of J. Crew's code of ethics, reporting requirements and Employee Resident Rule. Unbeknownst to Doughty, Manno was eavesdropping on the call listening intently outside Doughty's office door.

27.     After Doughty reported to J. Crew that Manno willfully and knowingly (i) misrepresented to her Manno's putative church relationship with Lord; (ii)  directly lied to her and to J. Crew when he denied that he and Lord were living together; (iii) was hostile with co-employees behind her back; and, (iv) was living with Lord – in violation of J. Crew's ethics and Employee Resident Rule – as she was required to do by J. Crew's ethics rules and mandatory reporting requirements, J. Crew told Doughty that (a) she was a "bad human"; (b) was unfit for J. Crew employment; and, (c) was terminated effective immediately.

28.     At termination, it was clear to Doughty that J. Crew had no intention to enforce its own ethics, mandatory reporting and Employee Resident Rules, or otherwise arbitrarily enforced their rules; and, that J. Crew had no intention to conduct a thorough and proper investigation of

Manno and his conduct in violation of J. Crew's employee rules.

29.    At all relevant times, J. Crew owed Doughty certain contract obligations and responsibilities, including *inter alia* performing and enforcing agreed upon employer-employee rules and regulations set forth in the parties' employment contract, handbook and associated papers, and conducting a proper investigation and resolution of store director claims without retaliation.

30.    At all relevant times, J. Crew's promises, agreements, employment contact, employee handbook and associated papers constitute a contract between the parties. As set forth in the parties' contract, Doughty had an affirmative obligation and responsibility as a J. Crew store director to investigate and to report employee violations of J. Crew's employment policies, like the Employee Resident Rule, to her supervisor (regional director), Nelson, which she did.

31.    At all relevant times, Doughty was performing her obligations and responsibilities under the parties' Contract, which terms required her to investigate and to report to J. Crew Manno's knowing and willful misrepresentations to Doughty and to J. Crew regarding his violation of J. Crew's Employee Resident Rule and verbal abuse of other employees at work.

32.    At all relevant times, J. Crew owed Doughty a Contract obligation and an implied duty of good faith and fair dealing to permit Doughty to perform her employment Contract without retaliation for performing her Contract obligations.

33.    J. Crew owed Doughty also a Contract obligation and an implied duty of good faith and fair dealing to comply with its own Contract terms as to internal investigations protocol relating to Doughty's employment Contract prior to termination.

34.    J. Crew's conduct of (i) terminating Doughty for performing her job obligations and responsibilities and of (ii) failing to follow its own investigation protocol as relating to

6

Doughty's wrongful termination constitutes Contract breach and breach of good faith and fair dealing due and owing thereunder.

35.    At termination, J. Crew failed, neglected or otherwise refused to comply with state and federal laws relating to, *inter alia,* salary and compensation benefits, portable health insurance (COBRA) and unemployment reporting. Specifically, J. Crew failed to pay Doughty her full salary and compensation due, failed to provide COBRA paperwork and knowingly misrepresented to the South Carolina Department of Employment and Workforce that Doughty was "terminated for cause" resulting in summary denial of her rightful unemployment benefits.

36.    As a direct, proximate and foreseeable result of J. Crew's unlawful conduct, Doughty sustained substantial damages, including without limitation, loss of employment income, compensation and bonuses due and owing Doughty for work performed and loss of health insurance and unemployment benefits, loss of career growth opportunity and loss of the ability to be hired in a comparable retail director position.

<u>COUNT</u> I
Breach of Contract and
Breach of Good Faith and Fair Dealing

37.    Plaintiff repeats, realleges and incorporates by reference the preceding allegations set forth in this complaint as if the same were fully set forth herein.

38.    Doughty and J. Crew entered into a valid, binding and enforceable employment Contract.

39.    Doughty performed all her obligations and responsibilities under the Contract. Doughty, as a store director, performed the responsibilities that were expected of her in the handbook, which required her to take prompt and effective action when appropriate for the safety of J. Crew and its employees and for the protection of J. Crew's assets, reputation and business

interests.

40.     J. Crew breached the Contract without justification or legal excuse by their knowing, willful and wanton disregard for, and failure to perform, their express obligations and responsibilities under the Contract in the particulars set forth in this complaint.

41.     At all relevant times, J. Crew owed to Doughty an implied duty of good faith and fair dealing under the parties' employment Contract.

42.     J. Crew's failure to conduct a thorough and proper investigation of Doughty's report of Manno's misrepresentations, lies, hostility to co-workers and violation of J. Crew's Employee Resident Rule constitutes a breach of the implied duty of good faith J. Crew owed to Doughty.

43.     In addition to Doughty's actual damages in excess of $350,000, Doughty pleads foreseeable special damages of $25,000 the direct result of J. Crew's Contract breach in the following particulars:

      a.   Sale of securities at loss to cover immediate housing costs and necessities; and,

      b.   Sale of certain personal effects to cover necessaries and living expenses.

44.     As a direct, proximate and foreseeable result of the Defendant's contract breach, and breach of good faith and fair dealing, the Plaintiff sustained damages in excess of $375,000.

<u>COUNT II</u>
Breach of Contact Accompanied by Fraudulent Act

45.     Plaintiff repeats, realleges and incorporates by reference the preceding allegations set forth in this complaint as if the same were fully set forth herein.

46.     Doughty and J. Crew entered into a binding and enforceable employment Contract.

47.     J. Crew's knowing and willful adoption of Manno's (i) misrepresentation of his putative parishioner relationship with Lord; (ii) false statements to Doughty and J. Crew  that he

8

and Lord were not living together, when they were; and, (iii) hostility to co-employees, in violation of J. Crew's ethics and Employee Resident Rule *together with* terminating Doughty for reporting same constitutes breach of contract accompanied by a fraudulent act arising out of the parties' Contract relationship.

48.     As direct, proximate, and foreseeable result of the Defendant's breach of contract accompanied by fraudulent act, the Plaintiff sustained damages in excess of $375,000.

COUNT III
Promissory Estoppel and Quantum Meruit

49.     Plaintiff repeats, realleges and incorporates by reference the preceding allegations set forth in this complaint as if the same were fully set forth herein.

50.     At all relevant times, Doughty and J. Crew occupied an unambiguous employment agreement whereby Doughty would devote all or substantially all of her time, effort, skill and energy as a store director for the betterment and increased sales of J. Crew's stores nos. 116 and 1007.

51.     At relevant times, Doughty reasonably and justifiably relied on J. Crew's promises of fair and reasonable compensation, ongoing and future employment, job growth and career opportunity at J. Crew, which J. Crew presented to be a great growth opportunity for Doughty because, *inter alia,* J. Crew said it planned to open 400 new stores in the United States.

52.     In addition to Doughty's employment responsibilities as store director for store nos. 116 and 1007, J. Crew lured Doughty with promises and agreements of greater compensation, benefits, bonuses and career growth if Doughty would agree to commit to provide additional time and her professional acumen to the creation, design, development, promotion and implementation of J. Crew's national "new employee on boarding" Centralized Virtual Trainers program designed to transition new hires into the J. Crew family.

9

53.    At all relevant times, Doughty expended substantial time, effort and professional acumen - in addition to her store direction position - to the creation, design, development, promotion and implementation of J. Crew's national "new employee on boarding" training program, for which J. Crew failed to compensate Doughty.

54.    J. Crew's failure to compensate Doughty for her time and effort in the creation, design, development, promotion and implementation of J. Crew's national "new employee on boarding" training program, constitutes a breach of the parties' agreement.

55.    At all relevant times, Doughty's reliance was expected and foreseeable to J. Crew.

56.    Doughty sustained substantial pecuniary and non-pecuniary losses as the result of J. Crew's breach of its agreements and promises of greater compensation, benefits, bonuses and career growth to Doughty relating to Doughty's work on J. Crew's national "new employee on-boarding" Centralized Virtual Trainers program.

57.    J. Crew received and realized the benefit of Doughty's substantial time, effort and professional acumen - in addition to her store direction position - to the creation, design, development, promotion and implementation of J. Crew's national "new employee on boarding" training program, for J. Crew's sole benefit, to Doughty's substantial loss.

58.    J. Crew's retention of the benefit of Doughty's substantial time, effort and professional acumen without paying its value to Doughty is unjust.

59.    As a direct, proximate and foreseeable result of J. Crew's breach of their promises and agreements in the foregoing particulars and unjust enrichment, Doughty is entitled to and demands recovery of her pecuniary and non-pecuniary losses.

**Prayer for Relief**

WHEREFORE, the Plaintiff demands judgment in favor of the Plaintiff and as against the Defendant awarding Plaintiff on each of her causes of action the Plaintiff's actual, expectation, special and exemplary damages plus pre and post-judgment interest, *together with* her attorney fees and costs in such amounts as determined at trial, and for such other and further relief this Court deems fair and just.

Respectfully Submitted,

**J. Davis Law Firm, P.C.**

s/ James R. Davis
James R. Davis, Esq. (Fed. Bar #11577)
Kindrea N. Wilson, Esq. (Fed Bar # 13786)
BB&T Plaza Mail Drawer #16
234 Seven Farms Drive, Suite 211B
Daniel Island, South Carolina 29492
(843) 642-8333 (office)
jim@jdavispc.com

Dated: March 15, 2023